**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT W. PAISLEY, | CASE NO. 1:14-cv-01656-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS |
| Defendant. | |
| | Docs. 1, 9, 10, 13, 14 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Robert W. Paisley for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff asserts disability as a result of depression, anxiety, and pain. Plaintiff submitted an opinion from his therapist, a licensed social worker who had treated Plaintiff for four years. This opinion indicated that Plaintiff would be unable to work due to his impairments. The ALJ did not procure any medical opinion that contradicted Plaintiff's therapist's

opinion, and instead undertook a lay analysis of the medical evidence to assign it little weight. The ALJ's impermissible use of lay inference to reject the only medical opinion in the record precludes meaningful review. As a result, the Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings.

## II.    Procedural Background

On June 15, 2011, a previously filed application for benefits under the Act was denied by an ALJ. (Tr. 58-75). On July 29, 2011, Plaintiff filed an application for DIB under the Act. (Tr. 186-94). On October 25, 2011, the Bureau of Disability Determination denied Plaintiff's application (Tr. 76-99), and Plaintiff filed a request for a hearing on December 23, 2011.  (Tr. 141-42). On February 27, 2013, an ALJ held a hearing at which Plaintiff—who was represented by an attorney— and a vocational expert ("VE") appeared and testified. (Tr. 34-57).  On March 12, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 16-33). On May 3, 2013, Plaintiff filed a request for review with the Appeals Council (Tr. 13-15), which the Appeals Council denied on June 30, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On August 25, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On

November 24, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). On January 6, 2015, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 13). On February 6, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 14). On June 23, 2015, the Court referred this case to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.     Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and requires only "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### IV.     Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the

claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on June 4, 1962 and was classified by the regulations as a person closely approaching advanced age through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 37). Plaintiff has twelve years of education and past relevant work as a construction worker, material handler, maintenance mechanic helper, warehouse worker, plumber helper and welder. (Tr. 37, 53). He filed a previous application for disability, which was denied on June 15, 2011, on the

ground that he could perform sedentary work only. (Tr. 58-75).[1] Because the Court recommends remand based on the ALJ's failure to properly evaluate Plaintiff's mental RFC given the opinion from Plaintiff's therapist, the Court primarily limits its discussion to evidence of Plaintiff's mental impairments.

In July of 2008, Plaintiff lost his job as a welder due to a DUI, but was able to continue working as a plumber. (Tr. 334). However, he was admitted to Chambersburg hospital for depression and suicidal thoughts. (Tr. 334). He indicated that his plan was to hang himself and that he had been hospitalized for depression before. (Tr. 338). Plaintiff was assessed a GAF of 30 to 35. (Tr. 342). Plaintiff reported having "poor sleep secondary to the pain, poor appetite, decreased energy, increased withdrawal, increased depressive cognition." (Tr. 334). Most of Plaintiff's "depressive cognitions were centered around his pain issues." (Tr. 335). Plaintiff was discharged four days later. (Tr. 334).

On January 20, 2009, an MRI of Plaintiff's thoracic spine indicated minimal scoliosis. (Tr. 462).

On February 5, 2009, Plaintiff presented to the emergency room at Chambersburg Hospital. (Tr. 347). Notes indicate that Plaintiff had:

> [A] long-term history of chronic depression, multiple Behavioral Health hospitalizations in the past due to major depression and

---

[1] If Plaintiff were limited to sedentary work under the present application, he would be entitled to benefits because he became a person closely approaching advanced age. 20 C.F.R. § Pt. 404, Subpt. P, App. 2 §§201.12, 201.14.

suicidal ideation as well as a DUI, past smoking history, who presented with worsening shortness of breath associated with coughing, nasal greenish phlegm, and increased back pain secondary to coughing episodes. He was admitted by Dr. Cabello for intractable back pain and with Pain Services consult for further evaluation. In regards to his bronchitis episode where he presented with shortness of breath and coughing, he was treated here with ceftriaxone 1 g IV daily and Zithromax 500 mg po daily followed by 250 mg po daily. In addition, he also received prednisone in view that he had significant amount of wheezing on examination on admission.

Over the hospital course, his symptoms improved remarkably, still appeared very depressed and asked to see psychiatrist for further evaluation. Prior to Psychiatry, I elected to start the patient on Effexor 37.5 mg 1 tablet daily and with Xanax 0.25 mg p.r.n. with which he improved remarkably. In regards to his back pain, he does have a thoracic disk bulge T7-T8 and degenerative disk disease as revealed on thoracic MRI in August 2007 and a lumbosacral MRI at that time revealed bilateral facet degenerative disk disease L4-L5 and L5-S1. He underwent previous epidural injections on July 24, 2008, and January 16, 2009. Labs during the hospitalization were significantly unremarkable.

(Tr. 347). Plaintiff reported being sober for three months. (Tr. 351). In a psychiatric consultation, Plaintiff indicated that he was "about to lose [his] apartment and will be homeless." (Tr. 357). He indicated previous psychiatric admissions in March of 2007 and July of 2008. (Tr. 357). Plaintiff reported attending "some AA meetings" and "outpatient substance abuse program." (Tr. 357). Plaintiff "appear[ed] to report some symptoms of ADHD." (Tr. 357). Plaintiff had been "able to get a job but then lost it." (Tr. 357). Overall, the report indicates:

Mr. Paisley reports that over the last couple of weeks, his life has been complicated by going from his medical doctor to his pain clinic to try and get relief for his pain He has also had some bronchitis. His medical problems have got him down but even more distressing to him is that his life seems to be falling apart again. He is losing his apartment because he has not paid 2 weeks of rent.  He was able to get a job but then lost it. His closest friend died by suicide about 2 weeks ago. About 6 weeks ago, his brother-in-law apparently died. Last year, 2 close relatives had also passed away. In the face of all this stress, he is overwhelmed. He is agitated. Reports he is feeling depressed and down has thoughts about dying; however, he reports no clear-cut suicidal ideation. He reports no homicidal ideation. He has never had any suicidal attempts in the past. Mr. Paisley feels that he has had recurrent episodes of depression for the last 2-3 years that have been recognized, but he also admits at the same time that he has not been taking the antidepressant medications he has been prescribed before. He has also not been in therapy

It is clear that alcohol is his major problem and has been for many years. He started drinking since childhood and in the past had received inpatient rehab in Germany and also attending AA for many years. His drug of choice is whiskey and then a few beers. As his life has fallen apart around him, his drinking has increased resulting in 2 DUIs - 1 in December 2005 and a most recent 1 in January 2007, and even a short stay in prison after his second DU I. He is now on probation for 5 years. His most recent relapse in drug use was in November, and he is in a court mandated program now. He denies any history of seizures or blackouts and denies any recent alcohol abuse. In the past he has abused marijuana as well.

(Tr. 357). Plaintiff explained that he did not remain on prescription medication

because he ran out of insurance. (Tr. 358). On examination, Plaintiff was "was

clearly overwhelmed, irritable, and anxious" with insight that appeared limited.

(Tr. 358). He was assessed a GAF of 50. (Tr. 359).  Plaintiff was discharged three

days later, with an instruction to follow-up for an epidural injection on February 10, 2009. (Tr. 348).

The previous ALJ decision found that Plaintiff had not engaged in substantial gainful activity since April 28, 2009, his original alleged onset date. (Tr. 63). Plaintiff asserted that he stopped working on April 28, 2009 as a result of his conditions, after decreasing his work activity in January of 2009 as a result of his conditions. (Tr. 211).

On August 13, 2009, Plaintiff presented to the emergency room at Chambersburg Hospital. (Tr. 450). Notes indicated that:

> This is a 47-year-old gentleman who has a long-standing history of mid back pain related to a T7-8 disk problem. He has apparently been suffering a flare-up recently and states he cannot get into a position that does not hurt He has a pain clinic appointment for the 21 st but does not feel he can make it that long. He saw his family physician earlier in the month and is presently on a pain contract for 800 of Ibuprofen t.i.d. and 1 Percocet a day, which he says is not holding him. He had an MRI done yesterday. He does not know the results.

(Tr. 450). Plaintiff was provided a prescription for additional Percocet and was instructed to follow-up with the pain clinic on August 21, 2009. (Tr. 450).

On August 18, 2009, Plaintiff presented to the emergency room at Chambersburg Hospital after an "overdose" from "drinking alcohol and taking Xanax" and because he "does not care anymore." (Tr. 445). Notes indicate that Plaintiff had violated parole, and needed to be taken to jail. (Tr. 445). Plaintiff "states he is depressed because of his back and loss of his job." (Tr. 445).  The

Emergency Room report states, "[h]e has a history of worsening depression and was admitted to the hospital 7/2008." (Tr. 448). Notes further indicate that:

> He does meet inpatient criteria, however, because of his parole violation, he may need to be taken out to jail We are going to discuss with the psychiatrist whether he needs to be inpatient and psychiatrically cleared first or whether he can go to jail and follow up as an outpatient.

(Tr. 445). Plaintiff was incarcerated for twenty days. (Tr. 187).

On February 8, 2010, Plaintiff presented to the emergency room at Chambersburg Hospital complaining of tooth pain and a broken tooth. (Tr. 444). He explained that he had an outstanding bill at his dentist, and was referred to other dental providers. (Tr. 444). He was given penicillin, Naprosyn, and Ultram and discharged home. (Tr. 444).

On February 22, 2010, Plaintiff presented to the emergency room at Chambersburg Hospital complaining of depression "to the point where he was neglecting his ADL care, not sleeping well, eating well or even showering or bathing." (Tr. 362). He was admitted and spent a week in inpatient care. (Tr. 362). Plaintiff was suicidal with plans to overdose. (Tr. 362). Plaintiff reported that he had "not been able to work due to back pain, though he goes out and enjoys fishing and other activities." (Tr. 362). He reported anxiety symptoms, but it was "unclear whether these are withdrawal anxiety from benzodiazepine abuse." (Tr. 362). Plaintiff reported that he was continuing to treat with Dr. Potluri and a "peer

specialist." (Tr. 362). On admission, Plaintiff had a GAF of 30. (Tr. 363). He "avoided eye contact," had a loud volume of speech, was initially "agitated," had depressed and irritable mood and affect, his thought content reflected that he was preoccupied with pain issues and had depressive cognitions, with suicidal ideation. (Tr. 368). He was assessed to have alcohol dependence in "partial sustained remission" and depression, among other diagnoses. (Tr. 368). On discharge on March 2, 2010, he had a GAF of 60 and a decrease of depressive cognitions, although there was a "preoccupation with pain noted." (Tr. 363).

On May 14, 2010, Plaintiff presented to the emergency room at Chambersburg Hospital complaining of foot pain after walking "in the stream and twisted his foot." (Tr. 442). He was discharged with a prescription for Vicodin. (Tr. 442).

On August 8, 2010, Plaintiff presented to the emergency room at Chambersburg Hospital complaining of severe headache, cold sweats, and congestion. (Tr. 441). He was placed on a course of Zithromax and a tapering dose of prednisone, and was diagnosed with acute sinusitis and acute bronchitis. (Tr. 441).

On September 15, 2010, Plaintiff presented to the emergency room at Chambersburg Hospital because he was "feeling suicidal." (Tr. 372). He was admitted to the behavioral health unit, again for a week. (Tr. 372). Plaintiff's

diagnoses were expanded to include bipolar disorder. (Tr. 372). He indicated that he had been clean for the past twelve months. (Tr. 372). He was diagnosed with "alcohol dependence in full sustained remission." (Tr. 380). Plaintiff indicated that he had depressed cognitions with plans to hang himself or overdose with pills. (Tr. 372, 376). He indicated that he was "very reclusive over the last 5 days and has barely left his camper. He has not eaten much and has had some difficulty sleeping." (Tr. 376). Plaintiff reported "having anxiety symptoms, however he was attributing this to his recurrent nightmares and flashbacks" that he was getting from abuse as a child. (Tr. 372). He explained that "those memories are coming back now and making him more depressed." (Tr. 372). On admission, he was assessed a GAF of 30. (Tr. 374). On discharge on September 22, 2010, he had a GAF of 60. (Tr. 374).

On October 17, 2010, Plaintiff presented to the emergency room at Chambersburg Hospital complaining of shoulder pain after "some heavy lifting helping a friend move." (Tr. 440). Notes indicated "multiple past visits with back pain." (Tr. 440). Plaintiff had diffuse tenderness and decreased grip strength, and was diagnosed with "most likely muscle strain." (Tr. 440). He was discharged with a prescription for Tylenol with Codeine. (Tr. 440).

On December 29, 2010, Plaintiff presented to the emergency room at Chambersburg Hospital complaining of shortness of breath and wheezing that

exacerbated his back pain. (Tr. 437). Plaintiff reported depression in his history and had minimal back tenderness on examination. (Tr. 437). Plaintiff was discharged later that day.

On January 5, 2011, Plaintiff presented to the emergency room at Chambersburg Hospital with an exacerbation of his asthma. (Tr. 381). Plaintiff was "quite wheezy" and admitted for three days of inpatient care. (Tr. 382).

On January 3, 2011, Plaintiff had reported to Dr. Potluri that he was doing well on his medications. (Tr. 569). However, he was experiencing bronchitis. (Tr. 569). Dr. Potluri noted that his most recent GAF was 50 on July 19, 2010. (Tr. 569). Plaintiff's mental status examination was normal. (Tr. 568). Dr. Potluri noted that "overall he is trying to do everything he is supposed and taking his psych meds, continue to have a lot of anxiety, depression is not as bad." (Tr. 567). However, by February of 2011, Plaintiff reported being "really depressed, sleeping a lot, no energy at all, relationship ended 3 weeks ago, feeling hopeless." (Tr. 563). Plaintiff had "occasional negative thoughts about life not worth living but denies any suicidal thoughts." (Tr. 563). Plaintiff's mood was "anxious and depressed" and his attitude was "cooperative, discouraged, and hopeless." (Tr. 564). Plaintiff was prescribed Wellbutrin and his Abilify, lithium, trazodone and Klonopin were continued. (Tr. 565). On March 30, 2011, Plaintiff reported less depressive symptoms. (Tr. 559).

However, by May 2, 2011, Plaintiff was feeling anxious. (Tr. 555). His sleep was "okay but not able to sleep in deep sleep" and his AA meetings were "helping him to not isolate himself under stress." (Tr. 555). On June 13, 2011, Plaintiff reported having a rough time to Dr. Potluri, with "depression bad, can't keep a job for longer than a month, my back hurts real bad." (Tr. 551). Plaintiff's mood was "anxious and depressed" and his attitude was "cooperative, discouraged, and hopeless." (Tr. 552). On July 11, 2011, Plaintiff reported suicidal thoughts to Dr. Potluri but they were "not strong." (Tr. 547). Plaintiff was back on his medications but "tired…not sleeping." (Tr. 547). Plaintiff reported "some improvement in symptoms of depression and anxiety with addition of wellbutrin." (Tr. 547). His medication response was described as "minimal improvement." (Tr. 548). Plaintiff's Doxepin was increased at both visits for his insomnia. (Tr. 549, 553).

On July 12, 2011, Plaintiff presented to the emergency room at Chambersburg Hospital with chest pain after riding a bicycle. (Tr. 389, 397). He was admitted for inpatient care for two days. (Tr. 389). On July 13, 2011, a cardiac catheterization indicated abnormal left ventricular function. (Tr. 501). A scintigraphy showed "mild to moderate increased" update and a "mild to moderate partially reversible" perfusion defect in the left artery. (Tr. 395). The next day, a left heart catheterization with bilateral angiography indicated mild dilation of the left atrium, trivial regurgitation of the tricuspid valve, mildly increased thickness

and "paradoxical motion" which was "consistent with LBSB," moderately reduced systolic function with an ejection fraction of 40%, mild diffuse kypokinesis, mild concentric hypertrophy, and Doppler parameters that were "consistent with abnormal left ventricular relaxation." (Tr.497). He was discharged in improved condition on July 14, 2011. (Tr. 497).

On August 8, 2011, Plaintiff presented to the emergency department at Chambersburg Hospital stating "I cannot take it anymore." (Tr. 428). The emergency room report indicated that:

> This is a 49-year-old gentleman with a history of chronic back pain. His back pain seemed to flare-up over the weekend after he was lifting some steel material as a trailer yesterday. He is having excruciating pain at this time. When he has flares up of this pain, it makes him feel very depressed and suicidal. He is stating that he is having suicidal thoughts at this time. No radiation of pain into the lower extremities.

(Tr. 433). Plaintiff "moved around without too much difficulty" and had paraspinal tenderness, but his examination was otherwise benign. (Tr. 433). Plaintiff indicated that he had not abused alcohol for twelve months, and was diagnosed with "alcohol dependence in full sustained remission." (Tr. 427). Plaintiff was voluntarily admitted, and "it was apparent that his pain symptoms are contributing to his depressed mood." (Tr. 427). On admission, Plaintiff reported that:

> His friend whom he has been living with weighs 400 pounds, and he is 68 years old, and he is forcing him to start a business, and he does not feel he is able to handle the stress and the workload because of his

> bad back. He also reports 2 of his friends have passed away recently, and that is making him depressed, and on top of that, he has been turned down from Social Security Disability. He is under significant financial stress. He states he only gets a little money from welfare and from the V.A. for his asthma, and he does not feel that he can survive like this. As a result of which, yesterday he was feeling suicidal and was feeling hopeless and decided to come into Chambersburg Hospital's emergency room to talk to Crisis and did not show up for Dr. Potluri's appointment. The patient denies of having any acute worsening of the posttraumatic stress disorder symptoms. He denies any flashbacks and is motivated to continue treatment as an inpatient.

(Tr. 428). On physical examination, his range of motion was "limited because of perceived pain." (Tr. 429). He was assessed a GAF of 30. (Tr. 427).

On August 9, 2011, Plaintiff had an inpatient pain consultation. (Tr. 435). Plaintiff reported chronic mid-back pain present for several years, that was on a "9-10" on a ten point scale. (Tr. 435). Plaintiff reported that diclofenac cream, lidoderm patches, and a TENS unit had not given him much relief in the past. (Tr. 435). On examination, Plaintiff had "marked tenderness" in his thoracic spine and pain on range of motion. (Tr. 436). Plaintiff was assessed to have "acute exacerbation of chronic midback pain, left thoracic spondylosis without myelopathy, left thoracic facet syndrome." (Tr. 436). Plaintiff was "to be scheduled for left thoracic facet medial nerve branch blocks." (Tr. 436). Plaintiff remained hospitalized for four days, and he "had significant resolution of his mood symptoms" upon discharge with a GAF of 60. (Tr. 427).

On August 15, 2011, Plaintiff followed-up with Dr. Potluri. (Tr. 543). Plaintiff reported feeling "pretty depressed in the past four weeks" and his "sleep was not that good, but Dr. Chakrabarti gave him some clonopin and it is helping." (Tr. 543). He denied depression symptoms and indicated that he was "feeling better" after his discharge. (Tr. 543).

In September of 2011, the "state agency psychological consultant concluded that there was insufficient evidence to make a disability determination." (Tr. 27).

On October 11, 2011, Plaintiff followed-up with Mr. Hand. (Tr. 968). His mental status examination was normal, but he reported having some significant back pain lately. (Tr. 969). Plaintiff reported that his doctors indicated that he would "probably have to take 1-2 weeks off from heavy exercise or work….he does not know how he will do that. He feels like he is indebted to the man who lets him live on his property. He is fearful that he will be told to leave if he doesn't help." (Tr. 970). Plaintiff was on the list for low income housing in Chambersburg and had "been making it to all his appts and has been following up with jail diversion." (Tr. 970).

On October 13, 2011, Plaintiff followed-up with Dr. Potluri. (Tr. 538). He was compliant with his medications and "alright mentally" but was in a "tremendous amount of pain." (Tr. 538). Plaintiff's diagnoses included "[a]cute alcoholic intoxication in alcoholism, unspec." (Tr. 538). Plaintiff's GAF was noted

to be 55 on June 13, 2011, and his medications were continued. (Tr. 540). Dr. Potluri noted that Plaintiff had finished his alcohol rehabilitation, but was still in the jail program. (Tr. 540). On October 31, 2011, Plaintiff presented to Mr. Hand with depressed mood. (Tr. 964). He was feeling "pretty hopeless at this point" and Mr. Hand "discussed with him that he needs to appeal his social security claim with an attorney." (Tr. 966). Mr. Hand also "encouraged an earlier [appointment] with Dr. Potluri for medication adjustment as well." (Tr. 966).

On November 28, 2011, Plaintiff followed-up with Dr. Potluri. (Tr. 960). Plaintiff reported experiencing mood swings, irritability, and "feeling more sad and more emotional." (Tr. 960). He had a sleep disturbance secondary to pain and decreased appetite and energy. (Tr. 960). Overall he had "increased symptoms of depression and anxiety and hopelessness." (Tr. 960). Plaintiff explained that he was feeling more depressed because of an increase in pain and being rejected from Social Security. (Tr. 960). He reported a "tremendous amount of pain" and "constant worrying anxiety about not having a place to go" because he was about to be homeless. (Tr. 960). Plaintiff's medication response was described as "minimally improved" and his medications were continued. (Tr. 961-62). On December 21, 2011, Plaintiff reported "continued…symptoms of depression and anxiety" but was "feeling better because of improved social issues and now he [is] secure" and able to remain at his home. (Tr. 955). His sleep was poor. (Tr. 955).

On mental status examination, his mood was anxious and depressed, and his medications were continued. (Tr. 956-57).

On January 4, 2012, Plaintiff reported to Mr. Hand that he was not feeling well due to back pain and asked to end the session early. (Tr. 952). He indicated that he had hired an attorney to appeal his Social Security claim. (Tr. 952). On February 3, 2012, Plaintiff indicated that he had been drinking again and had been caught by his probation officers. (Tr. 948). He reported that "[t]hey did not arrest him but they could charge him with a probation violation....he was glad that he was caught because he does not want to continue drinking and falling back into his alcoholism. He is discouraged and hopeless for the future. He does not think that things are going to get any better. He is in considerable back pain and is followed at the pain clinic monthly." (Tr. 948). On examination, he had a "cooperative, discouraged and hopeless" attitude. (Tr. 947). On February 8, 2012, he reported to Dr. Potluri that he had "ups and downs" and "slipped on alcohol last week" and "still [had] all those problems like no place to live." (Tr. 942). On examination, his mood was depressed and anxious. (Tr. 943). His medications were continued. (Tr. 944). On February 21, 2012, he reported to Mr. Hand that he had been offered an apartment from the county that was "on the third floor but he will deal with that for the time being." (Tr. 939). He was "in a much happier mood today and less pain as well." (Tr. 939). In March of 2012, he indicated that there was a "former associate

of his that is going to be living next to him…he does not get along with her and…they have had a checkered past. He is going to do his best to ignore her." (Tr. 935). He requested to cut his session short due to back pain. (Tr. 934).

In March of 2012, Plaintiff moved into his apartment, and he reported that he was "doing well" through March and April of 2012. (Tr. 919-29). His GAF was increased to 62 and his alcohol relapse was described as a "minor relapse" that led to additional drug and alcohol counseling. *Id*.

In May of 2012, Plaintiff began reporting feeling sick, tired, and unable to fish. (Tr. 887-97). His mental status examination indicated that he was depressed, and he reported feeling "always anxious and feeling on pins and needles." (Tr. 887-97). His Klonopin was switched for Valium to "decrease muscle spasms and also help with anxiety relief." (Tr. 887-97). On June 7, 2012, he reported that he was "pretty depressed, my anxiety is off the wall" and that he was "tense all the time" with "bad back problems." (Tr. 878-83). He explained that increased pain and the stress of a broken relationship had increased his anxiety and depression over the past three months, and on mental status examination his mood was anxious and depressed. *Id*. He had no current alcohol usage and reported his last drink was four months earlier. *Id*. His medications were continued. *Id*

Over the next month, Plaintiff reported that his spirits had been higher and he had been sleeping particularly well. (Tr. 871, 873). He finished his drug and

alcohol class, and was seeing a peer specialist, who was helping. (Tr. 871). On July 5, 2012, Plaintiff reported to Dr. Potluri that social issues had been bothering him and Dr. Potluri increased his valium. (Tr. 864).

On July 10, 2012, he reported to Mr. Hand that he had "been feeling stressed and depressed recently. He stated that he has been having a hard time due to remembering a lot of abuse and negative things that had happened to him in the past." (Tr. 861). Mr. Hand observed on mental status examination that Plaintiff's affect was depressed. (Tr. 860). His mood remained depressed on examination at a follow-up on August 6, 2012. (Tr. 855). On August 16, 2012, Dr. Potluri observed that his mood was anxious and depressed. (Tr. 850). He reported "ups and downs" but that more good things had happened that month. (Tr. 849). He also reported total abstinence from alcohol for "5-6 months." (Tr. 852).

On August 10, 2012, Plaintiff reported the he was "doing well" and his mental status examination was normal. (Tr. 845-46). Mr. Hand observed that he "continues to have ups and downs but maintains hope that things will get better." (Tr. 843). On September 4, 2012, his mental status examination indicated depressed mood, and he reported frustration with his jail diversion program when they planned a luncheon at a location that might trigger his alcoholism and an incident where he put a man in a headlock after he charged at him. (Tr. 839-40).

On September 18, 2012, his mental status examination was again normal. (Tr. 834-36).

On September 27, 2012, Plaintiff followed-up with Dr. Potluri. (Tr. 828). He reported a "lot of anxiety and lot of worry," as he had lost cash assistance and was having a difficult time with finances. (Tr. 828). Plaintiff was "[f]eeling up and down emotionally regarding some issues related to his current apartment. Sleep fairly well, appetite good, energy normal. Continue symptoms of depression and increased anxiety. Increase mood swings [and] anger problems." (Tr. 828). On mental status examination, his reasoning, impulse control, judgment and insight were poor. (Tr. 829). On October 2, 2012, Plaintiff reported that he had continued back pain and had been "feeling depressed but has been dealing with it by talking to his peer specialist Kat." (Tr. 825). On October 16, 2012, Plaintiff's mood on mental status examination was depressed, and he reported feeling some pain. (Tr. 821). He indicated that his pain made him feel "more depressed at times but has been trying to fight through it to complete his ADLS." (Tr. 821).

On November 13, 2012, Plaintiff followed-up with Mr. Hand. (Tr. 815). On mental status examination, his reasoning, impulse control, judgment and insight were poor. (Tr. 815). Mr. Hand observed that Plaintiff:

> [S]melled of alcohol today and avoided answering questions that were asked about his recent alcohol use. He is no longer on probation and is still working towards his social security claim. He stated that he had a 3 hour meeting with his attorney to discuss his case. Robert is not very

optimistic but his attorney seems to have hope that things will progress without any problem. We talked about his family a little bit. Some of his brothers and sisters have been supportive recently – especially with help for his back pain. One offered to set up an appt with a doctor in VA for him.

(Tr. 817).

On November 21, 2012, Plaintiff followed-up with Dr. Potluri. (Tr. 809). On examination, his mood was anxious and depressed. (Tr. 809). Dr. Potluri noted that Plaintiff reported his "anxiety [was] high over the past week." (Tr. 809). Plaintiff was "feeling better" but his sleep was disturbed and he "continued to have symptoms of depression and anxiety, constant racing thoughts and mood swings, anger problems." (Tr. 809). Dr. Potluri noted that Plaintiff's most recent GAF was 62 on October 2, 2012. (Tr. 811). On December 4, 2012, Mr. Hand noted Plaintiff "discussed that he was feeling a little sore today. He strained his back when bringing groceries up to his 3rd floor apartment. He stated that he has not been able to go hunting yet. He has had a lot of appointments and has not had transportation to get to his hunting spots either. He stated that he is hoping to go tomorrow since the end of rifle season is at the end of the week. We talked about his mood. He stated that he goes through spells of depression but he seems to be coping with it ok. He has been having some trouble sleeping but Dr. Potluri recently increased his ability and is hoping that will help." (Tr. 806). His mental status examination was normal. (Tr. 804).

On January 31, 2013, Plaintiff reported to Dr. Potluri that he was "overall doing alright, I got lot of anxiety, lot of issues with pain, past 5 months I am getting epidural shots…last was a very bad experience…my pain doctor wanted a second opinion and he is recommending a nerve stimulator, but it is expensive." (Tr. 799). On examination, Plaintiff's mood was depressed and anxious and attitude was cooperative, depressed and hopeless. (Tr. 799). Plaintiff reported that increasing Abilify had caused "some twitching in his muscles." (Tr. 799). He was "[f]eeling alright" but "[c]ontinued to have symptoms of depression, anxiety, and chronic pain. Worried about his financial future and survival issues." (Tr. 799). Plaintiff reported total abstinence from alcohol for more than a year. (Tr. 801). On February 1, 2013, Mr. Hand observed on examination that Plaintiff was depressed, but "doing ok today." (Tr. 795-96). Plaintiff indicated that he hoped his disability would be approved because he wanted a new apartment without as many steps to go up and down, which would "relieve a lot of stress and depression from him." (Tr. 796). On February 12, 2013, Plaintiff's mental status examination was normal, but he reported that he would have to wait for further epidural injections in his back because his doctor did not take his insurance, but they "have been helping with the pain a lot when he gets them." (Tr. 789).

On February 4, 2013, Mr. Hand authored a medical source statement. (Tr. 782-84). He opined that Plaintiff was unable to meet competitive standards in

maintaining regular attendance and being punctual within customary, usually strict tolerances, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, dealing with normal work stress, and dealing with the stress of semiskilled and skilled work. (Tr. 782). "Unable to meet competitive standards" was defined on the form as "your patient cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting." (Tr. 782). He opined that he would be seriously limited, but not precluded, in working with others, responding to supervisors, and getting along with coworkers or peers. (Tr. 782). He explained that Plaintiff complaints of "severe back and joint pain," he "sees the pain specialist on a regular basis for help with that but it limits his physical and mental ability to function when he is in pain. He also has a low frustration tolerance and may react negatively to criticism from supervisors or peers." (Tr. 783). He further explained that Plaintiff's "depression worsens when stressed." (Tr. 783). He opined that Plaintiff would be absent more than four days per month. (Tr. 784). He specifically opined that "alcohol or subset abuse [do not] contribute to any of your patient's limitations." (Tr. 784).

On February 27, 2013, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 34). Plaintiff testified that he lived in an apartment by himself, with

"MHID which helps [him] to pay [his] rent," and receives compensation from Veteran's Affairs for ten percent disability for asthma. (Tr. 38). He testified that he has problems showering and doing groceries because he has a problem "getting the groceries up the steps." (Tr. 39). He explained that he does not have a drivers license, and only walks if it is "real close," otherwise he "usually [has] a friend that takes [him] or—or family" because of his "problem with walking long distances." (Tr. 39). He indicated that he could not walk longer than one block. (Tr. 40). He testified that he could not bend over to touch his toes, so he had to sit down to put on socks and shoes, and could only walk up ten stairs before needing to stop. (Tr. 40). He could not give a definite answer on how long he needed to stand, and indicated that he typically could only sit for ten to fifteen minutes due to back pain. (Tr. 41). He testified that he did not drink alcohol and took his medications as prescribed. (Tr. 42). He reported that he had painful side effects from epidural injections. (Tr. 42).

He testified that he feels depressed "pretty much all the time" and that it's worse when he has pain. (Tr. 43). He explained that he has "problems sleeping and then [he] can't get up in the mornings…[he] get[s] a lot of hopelessness and worry and [he] just can't function." (Tr. 43). He testified that his depression, combined with his physical limitations, render him unable to go fishing and hunting which "makes [him] depressed…because [he] grew up doing those things." (Tr. 44). He

testified that he had gone fishing a month earlier, but had not gone hunting in several years. (Tr. 44). He indicated that his depression would cause him to stay in bed and not eat for days. (Tr. 45). He also testified that depression interfered with his personal care, because he has to force himself to shower and "a lot of times" does not even get dressed. (Tr. 45). He indicated that these periods of depression could last up to eight days and occurred every "couple of months." (Tr. 45). He described his depression as a "heavy feeling" with "no energy in [his] body…like [he is] lugging around a ton of bricks." (Tr. 47). He also identified anxiety, which he described as feeling like he was "going to jump out of his skin." (Tr. 47). He testified that he was unable to keep up with cleaning or chores on a day to day basis due to his mental impairments. (Tr. 48). He also testified that his depression and anxiety impaired his concentration at work. (Tr. 50).

On March 11, 2013, Dr. Potluri authored a medical source statement. (Tr. 972-74). He opined that Plaintiff would be unable to meet competitive standards in maintaining regular attendance and being punctual within customary, usually strict tolerances and performing at a consistent pace without an unreasonable number and length of rest breaks. (Tr. 972). "Unable to meet competitive standards" was defined on the form as "your patient cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting." (Tr. 972). He also opined that Plaintiff was seriously limited, but not

precluded, in multiple other areas of functioning, such as maintaining attention, responding appropriately to supervisors, interacting with coworkers and the public, dealing with changes in a work setting and normal work stress, and performing semi-skilled and skilled work. (Tr. 972-73). "Seriously limited, but not precluded" is defined as "seriously limited and less than satisfactory, but not precluded in all circumstances." (Tr. 972). He specifically opined that "alcohol or substance abuse [do not] contribute to any of the patient's limitations." (Tr. 974). He explained that "chronic pain is interfering with his emotional state, causing depression and severe anxiety, currently taking multiple psychotropic medications." (Tr. 974). He also indicated that Plaintiff would worsen without medication and "may not function." (Tr. 974). As support for his opinion, he referred to his longitudinal treatment record. (Tr. 972-74). Dr. Potluri's opinion was not submitted to the ALJ. (Tr. 1-5).

## A. ALJ Findings

On March 12, 2013, the ALJ issued the decision. (Tr. 29). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 16, 2011, the alleged onset date, and was insured through December 31, 2014 (Tr. 21). At step two, the ALJ found that Plaintiff's obesity, depression, degenerative disc disease, alcoholic cardiomyopathy, and alcohol abuse, in partial remission were medically determinable and severe. (Tr.21). The ALJ found that his hypertension and asthma were medically determinable, but not severe. (Tr. 22). At

step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 22). In

crafting the RFC, the ALJ assigned limited weight to Mr. Hand's opinion because:

> However, the undersigned notes for the record that Mr. Hand is a
> therapist and is not qualified to make any assessments/opinions as to
> the claimant's physical pain or the impact it has on the claimant's
> functioning. The undersigned also finds that the restrictions of being
> unable to meet competitive standards is not consistent with Mr.
> Hand's treatment notes, the claimant's alcohol abuse, the reported
> situational stressors of financial and housing problems and the very
> limited examination findings. Mr. Hand's notes also contain GAFs of
> 62, which are inconsistent with an inability to meet competitive
> standards in any area of functioning. The undersigned gives limited
> weight to the assessment by Mr. Hand.

(Tr. 27). Thus, the ALJ found that Plaintiff had the RFC to perform:

> [L]ight work as defined in 20 CFR404.1567(b) and 416.967(b) except
> he requires alternating positions at will and needs to avoid
> concentrated exposure to irritants and hazards. The claimant is
> capable of occasional climbing stairs, balancing, stooping, kneeling,
> crouching and crawling. The claimant retains the mental capacity for
> simple routine and repetitive tasks in a work environment free from
> fast-paced production involving only simple work-related decisions
> with few, if any, work place changes and no interaction with the
> public.

(Tr. 24). At step four, the ALJ found that Plaintiff could not perform his past

relevant. (Tr. 27). At step five, the ALJ found that Plaintiff could perform other

work in the national economy as a potato chip sorter and a conveyor line bakery

worker. (Tr. 28).  Consequently, the ALJ found that Plaintiff was not disabled and

not entitled to benefits. (Tr. 29).

## VI.    Plaintiff Allegations of Error

## A.    Evaluation of the medical opinions

Plaintiff asserts that the ALJ erred in assigning little weight to Mr. Hand's opinion. Defendant argues that "in the Third Circuit, a claimant's eligibility for benefits cannot rest upon the opinion of a non-acceptable medical source such as social worker Hand." (Def. Brief at 16) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 361 (3d Cir. 1999)). Defendant further contends that "Mr. Hand cannot render a psychological opinion on [Plaintiff's] mental abilities." (Def. Brief at 17).

Defendant misstates that law. Identifying an opinion as from a non-acceptable medical source means only that it cannot "receive controlling weight, however, [that] does not mean that it is not entitled to consideration." *Carole v. Colvin*, 14-1501, 2015 WL 4162446, at *2 (W.D. Pa. July 9, 2015). In *Hartranft*, the only case cited by Defendant, the full context of the quote shows that the Court merely held that the opinion was not entitled to controlling weight. The Court went on to provide full analysis of the opinion, rather than rejecting it merely because it was from a non-acceptable medical source:

> However, a chiropractor's opinion is not "an acceptable medical source" entitled to controlling weight. 20 C.F.R. § 416.913 defines "acceptable source" for purposes of our inquiry as:
> (1) Licensed physicians;
> (2) Licensed osteopaths;
> (3) Licensed or certified psychologists;
> (4) Licensed optometrists for the measurement of visual acuity and visual fields .... and

(5) Persons authorized to send ... a copy or summary of the medical records of a hospital, clinic, sanitorium, medical institution, or health care facility....

(6) A report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source is also considered acceptable medical evidence.

*See also Diaz v. Shalala,* 59 F.3d 307, 313 (2d Cir.1995); *Wolfe v. Shalala,* 997 F.2d 321, 327 (7th Cir.1993); *Walker v. Shalala,* 993 F.2d 630, 632 n. 2 (8th Cir.1993); *Lee v. Sullivan,* 945 F.2d 687, 691 (4th Cir.1991) (per curiam). Although DIB eligibility can not rest upon the opinion of a chiropractor, a hearing examiner can *consider* a chiropractor's opinion, along with all of the other evidence that a claimant may present insofar as it is deemed relevant to assessing a claimant's disability. *See* 20 C.F.R. § 416.913(e)(3) ("information from other sources may also help us to understand how your impairment(s) affects your ability to work. Other sources include, ... (3) Other practitioners for example, chiropractors") (internal parentheses omitted).

Here, examinations by three board certified physicians failed to corroborate LaBarre's opinion of the extent of Hartranft's disability. None of these doctors identified the neurological abnormalities reported by LaBarre. Moreover, Hartranft's own account of the activities he was able to perform was consistent with the medical observations of those three board certified physicians, and inconsistent with the degree of limitation that LaBarre reported.

*Hartranft v. Apfel*, 181 F.3d 358, 361-62 (3d Cir. 1999).

Defendant correctly notes that SSR 06-3p also provides that "[s]econd, only "acceptable medical sources" can give us medical opinions. See 20 CFR 404.1527(a)(2) and 416.927(a)(2)." *Id.* Both regulations define medical opinions as statements that "reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can

still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R.

§404.1527(a)(2); 416.927(a)(2). However, SSR 06-3p also states:

> In addition to evidence from "acceptable medical sources," we may
> use evidence from "other sources," as defined in 20 CFR 404.1513(d)
> and 416.913(d), to show the severity of the individual's impairment(s)
> and how it affects the individual's ability to function…Information
> from these "other sources" cannot establish the existence of a
> medically determinable impairment. Instead, there must be evidence
> from an "acceptable medical source" for this purpose. However,
> information from such "other sources" may be based on special
> knowledge of the individual and may provide insight into the severity
> of the impairment(s) and how it affects the individual's ability to
> function.

Thus, to the extent that *Hartranft* would have supported Defendant's contention

that "Mr. Hand cannot render a psychological opinion on [Plaintiff's] mental

abilities," (Def. Brief at 17), and that "the ALJ was not required to consider the

opinion of Mr. Hand, who is a social worker," SSR 06-3p supersedes that rationale

with its plain declaration Mr. Hand's opinion may be used to how Plaintiff's

mental impairments "affects [his] ability to function." *Id.*; *see also* 20 C.F.R. §

416.913(e)(3).

More importantly, the ALJ did not support his RFC with any medical

opinion. Generally, an ALJ may not reject all of the medical opinions in the record

and assess an RFC that is greater than found by the medical professionals. As

Courts in this District have repeatedly emphasized:

> The Court recognizes that the residual functional capacity assessment
> must be based on a consideration of all the evidence in the record,

including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. *See Burnett v. Commissioner of Social Sec. Admin.,* 220 F.3d 112, 121–122 (3d Cir.2000). However, rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. *See Doak v. Heckler,* 790 F.2d 26, 29 (3d Cir.1986) ("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).

*Gormont v. Astrue*, 3:11-CV-02145, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013) (Nealon, J.); *see also Bloomer v. Colvin*, 3:13-CV-00862, 2014 WL 4105272, at *5 (M.D. Pa. Aug. 19, 2014) (Jones, J.); *House v. Colvin*, 3:12-CV-02358, 2014 WL 3866072, at *8 (M.D. Pa. Aug. 6, 2014) (Kane, J.); *Muhaw v. Colvin*, CIV.A. 3:12-2214, 2014 WL 3743345, at *15 (M.D. Pa. July 30, 2014) (Mannion, J.). *Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014) (Mariani, J.); *Arnold v. Colvin*, 3:12-CV-02417, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014) (Brann, J.); *Kaumans v. Astrue*, 3:11-CV-01404, 2012 WL 5864436, at *12 (M.D. Pa. Nov. 19, 2012) (Caputo, J.); *Troshak v. Astrue*, 4:11-CV-00872, 2012 WL 4472024, at *7-8 (M.D. Pa. Sept. 26, 2012) (Munley, J.); *Shedden v. Astrue*, 4:10-CV-2515, 2012 WL 760632, at *11 (M.D. Pa. Mar. 7, 2012) (Rambo, J.); *Duvall-Duncan v. Colvin*, 1:14-CV-17, 2015 WL 1201397, at *11 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.); *McKean v. Colvin*, 1:13-CV-2585, 2015 WL 1201388, at *8 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.);

*Hawk v. Colvin*, 1:14-CV-337, 2015 WL 1198087, at *12 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.).

As Judge Mariani explains in *Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014):

> The ALJ's decision to reject the opinions of Maellaro's treating physicians created a further issue; the ALJ was forced to reach a residual functional capacity determination without the benefit of any medical opinion.
> …
> The ALJ's decision to discredit, at least partially, every residual functional capacity assessment proffered by medical experts left her without a single medical opinion to rely upon. For example, three physicians opined that Maellaro was limited in some way in his ability to stand and/or walk: Dr. Dittman opined that Maellaro could stand/walk for less than one hour, Dr. Singh believed that Maellaro could stand/walk for fewer than two hours, and Dr. Dawson opined that Maellaro could not stand or walk for any length of time. Tr. 183, 211, 223. In rejecting these three opinions, there were no other medical opinions upon which the ALJ could base her decision that Maellaro essentially had no limitations in his ability to stand or walk. Tr. 283. Consequently, the ALJ's decision to reject the opinions of Drs. Singh and Dawson, and the ALJ's determination of Maellaro's residual functional capacity, cannot be said to be supported by substantial evidence.

*Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014); *see also* Bloomer v. Colvin, 3:13-CV-00862, 2014 WL 4105272, at *6 (M.D. Pa. Aug. 19, 2014) (Jones, J.); ("The ALJ did not cite to a single medical opinion that contradicted [the treating source] opinion; thus, the ALJ improperly set his "own expertise against that of a physician who present[ed] competent medical evidence.' Consequently, the AJL's residual functional capacity

determination is not supported by substantial evidence.") (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (2d Cir.1999)).

No opinion contradicted Mr. Hand's. As the ALJ notes, the "state agency psychological consultant concluded that there was insufficient evidence to make a disability determination in September 2011 (Exhibit B7 A)." (Tr. 27). Mr. Hand is not a physician. However, his profession, licensed clinical social workers, is included as one of the "[m]edical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists." SSR 06-3p. An ALJ would not be classified as a "medical source" whatsoever. Thus, the ALJ rejected the only evidence from an individual with some medical training in favor of his lay inference. The rationale of the above-cited cases applies here, particularly where the ALJ made other errors. The ALJ also rejected Mr. Hand's opinion for the "wrong reason." *Plummer,* 186 F.3d at 429.

In *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000), the Third Circuit set forth the standard for evaluating the opinion of a treating physician, stating that:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer [v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999)] (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir.1994); *Jones,* 954 F.2d at 128; *Allen v. Bowen*, 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield*

*v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Brewster*, 786 F.2d at 585. The ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer,* 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. See *Adorno*, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent*, 710 F.2d at 115.

*Id.* at 317-318.

Here, the ALJ rejected Mr. Hand's opinion based on his own lay opinion. The Third Circuit has further explained that an ALJ should not glean inferences from treatment records where the treatment setting is free from the stresses of the workplace:

Dr. Erro's observations that Morales is "stable and well controlled with medication" during treatment does not support the medical conclusion that Morales can return to work. Dr. Erro, despite his notation, opined that Morales's mental impairment rendered him markedly limited in a number of relevant work-related activities. Other information in the treatment records supports this opinion. Thus, Dr. Erro's opinion that Morales's ability to function is seriously impaired or nonexistent in every area related to work shall not be supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting.

*Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). This is particularly important here, where Mr. Hand specifically indicated that Plaintiff's depression and

limitations worsen when he is stressed. (Tr. 782-84). Moreover, the record indicates that Plaintiff had frequent inpatient psychiatric hospitalizations, sometimes for up to a week. *Supra.* This corroborates Mr. Hand's opinion that Plaintiff's main struggles would be in maintaining regular attendance. Defendant similarly cites to the treatment records from Keystone Behavioral Health, (Def. Brief at 8-9, 14), but neither Defendant nor the ALJ had the medical training to reanalyze these records to supplant the opinion of a competent treating provider.

Beyond identifying Mr. Hand as a non-acceptable medical source, Defendant contends only that the ALJ was entitled to reject Mr. Hand's opinion because it was based in part on Plaintiff's preoccupation with pain and because Mr. Hand's treatment record indicates that Plaintiff was dealing with situational stressors. (Def. Brief at 18-19). A lay inference gleaned from treatment records that a preoccupation with pain or situational stressors contradicts an opinion that Plaintiff's depression and anxiety preclude him from meeting the attendance requirements of work impermissibly supplants the opinion of a competent professional. *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). Plaintiff's preoccupation with pain may have been a symptom of his depression. Plaintiff's preoccupation with situational stressors may have been a symptom of his depression. *Hernandez v. Apfel*, CIV. 99-611-HA, 2000 WL 33950825, at *1 (D. Or. Oct. 5, 2000) (physician opined that "depression 'impairs [claimant's] ability

to cope with situational stresses'"). No individual with medical training indicated that preoccupation with pain or situational stressors are mutually exclusive with or contradict depression and anxiety. The Court notes that "situational stressors" used to be referenced in the Listings for Mental Disorders, but is not longer described therein. *Griggs v. Schweiker*, 545 F.Supp. 475, 481 (S.D.W. Va. 1982); 20 C.F.R. Part 404, Subpart P, Appendix 1 §12.00 *et seq.* Moreover, there is no evidence that full-time employment would not create the type of situational stress that would render Plaintiff unable to work. *See Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000) (Consideration of a claimant's ability to function in the "stresses that accompany the work setting" is appropriate); *Kimble v. Colvin*, CV-11-3076-CI, 2013 WL 1290651, at *8 (E.D. Wash. Mar. 27, 2013) ("Dr. Martin also explained that when Plaintiff is under  situational stress, she experiences more symptoms of depression and anxiety and that combination would push Plaintiff's mild impairments to moderate in the category of the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."). Finally, the record contains evidence that, even when situational stress was lifted, Plaintiff was still bothered by memories of abuse as a child, along with other depression and anxiety symptoms. Plaintiff's symptoms temporarily alleviated in March of 2012, when he moved into a new apartment, but

by May of 2012, he began reporting feeling sick, tired, and unable to fish. (Tr. 887-97). His mental status examination indicated that he was depressed, and he reported feeling "always anxious and feeling on pins and needles." (Tr. 887-97). His Klonopin was switched for Valium to "decrease muscle spasms and also help with anxiety relief." (Tr. 887-97). In June of 2012, Plaintiff reported sleeping well, finishing his drug and alcohol class, and meeting with a peer specialist. (Tr. 864-73). However, by July 10, 2012, he reported to Mr. Hand that he had "been feeling stressed and depressed recently. He stated that he has been having a hard time due to remembering a lot of abuse and negative things that had happened to him in the past." (Tr. 861). In August of 2012, Plaintiff remained anxious and depressed, although "more good things had happened that month." (Tr. 849).

Elsewhere in Defendant's brief, Defendant relies on Plaintiff's activities of daily living, which Defendant asserts Plaintiff was able to do "continually." (Def. Brief at 3, 10). However, Plaintiff's physical abilities to fish and care for his personal needs do not negate disability. *See Fargnoli v. Massanari*, 247 F.3d 34, 44 (3d Cir. 2001) ("Fargnoli's trip to Europe in 1988 cannot be the basis for a finding that he is capable of doing a light exertional job because sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity"); *Smith v. Califano,* 637 F.2d 968, 971-72 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded

from all forms of human and social activity. Smith's activities are miniscule when compared to a plethora of cases which have held that there was total disability even when the claimant was far more active than Smith. It is well established that sporadic or transitory activity does not disprove disability."). Moreover, the medical record repeatedly indicates that Plaintiff's depression and anxiety impaired his ability to perform his activities of daily living. (Tr. 362, 821). At the hearing before the ALJ, he explained that he has "problems sleeping and then [he] can't get up in the mornings…[he] get[s] a lot of hopelessness and worry and [he] just can't function." (Tr. 43). He testified that his depression, combined with his physical limitations, render him unable to go fishing and hunting which "makes [him] depressed…because [he] grew up doing those things." (Tr. 44). He indicated that his depression would cause him to stay in bed and not eat for days. (Tr. 45). He also testified that depression interfered with his personal care, because he has to force himself to shower and "a lot of times" does not even get dressed. (Tr. 45). He indicated that these periods of depression could last up to eight days and occurred every "couple of months." (Tr. 45). Regardless, an ALJ may not reject a treating physician's opinion "due to his or her own credibility judgments." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000).

In sum, the ALJ crafted an RFC greater than the only opinion from a medical source, without obtaining any medical expert evidence from the state

agency. The ALJ independently reviewed Mr. Hand's treatment record, which reflected Plaintiff's functioning in an environment free from work stresses, and supplanted his lay opinion for that of a competent professional. Thus, the ALJ rejected Mr. Hand's opinion for the "wrong reason," and consequently, the RFC assessment lacks substantial evidence. *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000). The Court recommends remand for the ALJ to properly evaluate Mr. Hand's opinion and Plaintiff's RFC. The Court need not address Plaintiff's contention that Dr. Potluri's opinion constitutes new and material evidence, because Dr. Potluri's opinion (which corroborates Mr. Hand's opinion) will be available to the ALJ on remand and must be considered.

### B.  Plaintiff's history of alcohol use

The ALJ also improperly analyzed Plaintiff's alleged alcohol use. The ALJ concluded that Plaintiff was not disabled because his alcohol use contributed to his impairments. This is not the correct process for evaluating alcohol use. Instead, the ALJ must determine if Plaintiff is disabled including his alcohol use, which must be established with medical evidence. Then, the ALJ must decide whether Plaintiff would continue to be disabled if his alcohol abuse stopped.

An individual cannot be considered to be disabled if drug abuse or alcoholism is "material" to that consideration.  42 U.S.C. § 1382c(a)(3)(J); 20 C.F.R. § 416.935(a).  The SSA has published policy interpretation rulings, the

latest version of which is SSR 13–2p, 78 Fed.Reg. 11939 (Feb. 20, 2013), setting forth the process to be followed in conducting a DAA materiality inquiry.[2] Further, the SSA has provided guidance on the considerations for a DAA materiality inquiry through its Program Operations Manual System. *See* POMS § 90070.050.

Section 416.935, SSR 13–2p, and POMS 90070.050 set forth the applicable process for an adjudicator to determine whether DAA is a material contributing factor to a claimant's disability. First, the ALJ must decide if the claimant is disabled, following the general disability case development and evaluation procedures and considering the effects of DAA. POMS § 90070.050(B)(1). Second, the ALJ must decide if there is "medical evidence of DAA." POMS § 90070.050(B)(2). Finally, if there is medical evidence of DAA, the ALJ must re-evaluate the claimant as if the claimant had stopped using drugs and alcohol, and on that basis decide whether the DAA is a contributing factor material to the disability. POMS § 90070.050(B)(3), (D); 20 C.F.R. § 416.935(b)(2); SSR 13–2p, 78 Fed.Reg. at 11941–42.

---

[2] Social Security Ruling 13–2p was published on February 20, 2013 and, thus, came into effect before the ALJ's decision in this case was issued. Prior to the publication of SSR 13–2p, the principles discussed herein were substantially set forth in a prior policy interpretation ruling, SSR 82–60, as well as a "teletype" issued by the Commissioner, Emergency Message EM–96200. SSR 13–2p superseded both SSR 82–60 and EM–96200.

Stated differently, a DAA materiality determination is made only when "the claimant is disabled considering all impairments" and the ALJ has "medical evidence from an acceptable medical source establishing that a claimant has a Substance Use Disorder."  SSR 13–2p, 78 Fed.Reg. at 11941.

"Medical evidence of DAA" is a specifically defined term for purposes of the Social Security Act.   SSR 13–2p, 78 Fed.Reg. at 11944; POMS § 90070.050(C)(1)(a).  It means that the evidence is from "an acceptable medical source" and "[i]s sufficient and appropriate to establish that the individual has a medically determinable substance use disorder."   POMS § 22505.003(B)(1); POMS § 90070.050(C)(1)(a).  "[A] claimant has DAA only if he or she has a medically determinable Substance Use Disorder" as defined in *Diagnostic and Statistical Manual of Mental Disorders* (or "DSM"). SR 13–2p, 78 Fed.Reg. at 11941. "In general, the DSM defines Substance Use Disorders as maladaptive patterns of substance use that lead to clinically significant impairment or distress." *Id.* at 11940 (footnote omitted) (citing *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., text rev. 2000) ("DSM–IV–TR")).  As explained further by the SSA:

 (i) As for any medically determinable impairment, we must have objective medical evidence—that is, signs, symptoms, and laboratory findings—from an acceptable medical source that supports a finding that a claimant has DAA. This requirement can be satisfied when there are no overt physical signs or laboratory findings with clinical findings reported by a psychiatrist, psychologist, or other appropriate acceptable medical

source based on examination of the claimant. The acceptable medical source may also consider any records or other information (for example, from a third party) he or she has available, but we must still have the source's own clinical or laboratory findings.

(ii) Evidence that shows only that the claimant uses drugs or alcohol does not in itself establish the existence of a medically determinable Substance Use Disorder.... In addition, even when we have objective medical evidence, we must also have evidence that establishes a maladaptive pattern of substance use and the other requirements for diagnosis of a Substance Use Disorder(s) in the DSM. This evidence must come from an acceptable medical source.

SSR 13–2p; 78 Fed.Reg. at 11944.

The ALJ did not properly engage in the first step of the DAA analysis. First, the ALJ must decide if the claimant is disabled, including the effects of DAA. POMS § 90070.050(B)(1).  Instead, the ALJ determined that Plaintiff was not disabled, because of the effects of DAA. In other words, the ALJ conflated the first and third steps, and omitted the second step. If a claimant has DAA, the ALJ must consider whether the claimant would be disabled considering all impairments, including DAA. There is no evidence that the ALJ considered this or engaged in the proper steps of analysis, and this precludes judicial review. *See Gibson v. Colvin*, CIV.A. 14-1655, 2015 WL 4460986, at *4 (W.D. Pa. July 21, 2015) ("In cases like Plaintiff's, where there is a medically diagnosed mental disorder in addition to DAA, an ALJ must be able to point to evidence in the case record establishing that a claimant with a co-occurring mental disorder would not be disabled in the absence of DAA to support a finding that the DAA is material");

*Shannon v. Colvin*, CIV.A. 12-105 ERIE, 2014 WL 266805, at *11 (W.D. Pa. Jan. 23, 2014) ("If it is not possible to distinguish between the limitations created by drug or alcohol abuse and the claimant's other impairments, the ALJ must find that drug or alcohol abuse is not a contributing factor material to disability.").

Defendant and the ALJ pointed to Plaintiff's alleged alcohol use during the relevant period. However, this is insufficient to conclude that drug or alcohol abuse exist, because abuse is not the same as use. SSR 13–2p; 78 Fed.Reg. at 11944. ("Evidence that shows only that the claimant uses drugs or alcohol does not in itself establish the existence of a medically determinable Substance Use Disorder.... In addition, even when we have objective medical evidence, we must also have evidence that establishes a maladaptive pattern of substance use and the other requirements for diagnosis of a Substance Use Disorder(s) in the DSM."). Similarly, Defendant contends that Plaintiff's alcohol abuse was "a major factor in his lack of employment" because Plaintiff's "entire record was created due to court-ordered treatment." (Def. Brief at 20). Again, this is not the proper way to analyze whether alcohol abuse was material to Plaintiff's disability. Treatment alone does not indicate that alcohol abuse continued to be material to Plaintiff's disability. Instead, the record indicates that on August 8, 2011, Plaintiff indicated that he had not abused alcohol for twelve months, and was diagnosed with "alcohol dependence in full sustained remission." (Tr. 427). By October 13, 2011, Plaintiff

completed his alcohol rehabilitation program. (Tr. 540). Plaintiff admitted using alcohol once, in February of 2012, but avoided going to jail and regained sobriety. (Tr. 942, 948).  In March of 2012, his alcohol relapse was described as a "minor relapse" that led to additional drug and alcohol counseling. (Tr. 919-29).  In June of 2012, he had no current alcohol usage and reported his last drink was four months earlier. (Tr. 878-83). In August of 2012, he reported total abstinence from alcohol for "5-6 months." (Tr. 852). Plaintiff smelled of alcohol in November of 2012, but on January 13, 2013, reported total abstinence from alcohol for more than a year. (Tr. 801). Moreover, even if Plaintiff continued abusing alcohol during the relevant period, he may have still be considered disabled if his depression and anxiety rendered him unable to perform the attendance requirements of work. The Court notes that Plaintiff was diagnosed with bipolar disorder, and "bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her symptoms. . . . the fact that substance abuse aggravated [Plaintiff's] mental illness does not prove that the mental illness itself is not disabling." *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006).

Additionally, the ALJ was not entitled to rely on Mr. Hand's treatment records or Plaintiff's alcohol use in 2012 to conclude that Plaintiff had a substance abuse disorder because evidence of "a maladaptive pattern of substance use and the other requirements for diagnosis of a Substance Use Disorder(s) in the

DSM…must come from an acceptable medical source." SSR 13–2p; 78 Fed.Reg. at 11944. Defendant and the ALJ also noted treatment records where Plaintiff sought prescription narcotics for pain. However, the ALJ was not entitled to rely on Plaintiff's narcotics use because there was no evidence that they were not taken as prescribed. "DAA does not include…Addiction to, or use of, prescription medications taken as prescribed, including methadone and narcotic pain medications." SSR 13-2p.

Most importantly, the ALJ ignored the fact that Mr. Hand specifically opined that "alcohol or subset abuse [do not] contribute to any of your patient's limitations." (Tr. 784). The ALJ may not cite to Mr. Hand's treatment records to establish that alcohol abuse contributes to Plaintiff's limitations without acknowledging Mr. Hand's opinion that alcohol abuse does not contribute to Plaintiff's limitations. As the Third Circuit has explained:

> [T]he Secretary must "explicitly" weigh all relevant, probative and available evidence. *Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3d Cir.1979); *see also Brewster v. Heckler,* 786 F.2d 581, 584 (3d Cir.1986); *Cotter,* 642 F.2d at 705. The Secretary must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. *Brewster,* 786 F.2d at 585. The Secretary may properly accept some parts of the medical evidence and reject other parts, but she must consider all the evidence and give some reason for discounting the evidence she rejects. *Stewart v. Secretary of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983)

*Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *see also Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504-05 (3d Cir. 2009) ("The ALJ must provide a 'discussion of

the evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review") (quoting *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000)); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). With regard specifically to DAA, SSR 13-2p provides that "[a]ll adjudicators must provide sufficient information in their determination or decision that explains the rationale supporting their determination of the materiality of DAA so that a subsequent reviewer considering all of the evidence in the case record is able to understand the basis for the materiality finding and the determination of whether the claimant is disabled." *Id.; see also Wuerger v. Colvin*, CIV.A. 12-1428, 2013 WL 2254244, at *13 (W.D. Pa. May 22, 2013) (ALJ's decision was supported by substantial evidence because he "consider[ed] all of the relevant evidence and adequately supported his determination that DAA was material to Plaintiff's disability with substantial evidence."). Similarly, the ALJ appears to rely on previous diagnoses from Chambersburg Hospital of alcohol dependence in partial remission, without acknowledging that all of his hospitalizations during the relevant period included diagnoses of "alcohol dependence in full sustained remission." (Tr. 380, 427).   On remand, the ALJ will also have Dr. Potluri's opinion before him, and Dr. Potluri also opined that alcohol abuse did not contribute to Plaintiff's impairments during the relevant period. *Supra.*

The undersigned acknowledges that the Commissioner has previously argued for mechanical application of a rule that the steps of the DAA analysis do not need to be followed when there is a finding of not disabled. *See Burkhart v. Colvin et al,* 3:13-cv-1450 (M.D. PA July 23, 2015), Doc. 32, *Commissioner's Objection to Magistrate Judge Cohn's Report and Recommendation*. That argument puts the cart before the horse, because the first step of the DAA analysis is a determination of whether the claimant is disabled. An ALJ may not use alleged alcohol or drug use to conclude that a claimant is not disabled, and then use a finding of not disabled as a backdoor around the requirements of performing the full DAA analysis. This would eviscerate the DAA Regulations, particularly the requirement to identify medical evidence of substance abuse beyond mere substance use and to consider whether a claimant is disabled including alleged substance use, instead of just despite alleged substance use.

Defendant contends that Plaintiff's alcohol use was also relevant because it demonstrates that he was fired for reasons other than his conditions, writing:

> Here, Plaintiff, Robert W. Paisley (Paisley), was fired after he violated his probation and went to jail for alcohol and drug intoxication in August 2009 (Tr. 334, 357, 445, 602). See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) (explaining it is "relevant to credibility when a claimant leaves work for reasons other than h[is] medical condition"). Prior to being fired, Paisley complained of pain only to the extent that he sought narcotic medications at the emergency room (ER) on many occasions (Tr. 334, 351, 454, 460).

(Def. Brief at 2). However, there is no evidence that Plaintiff was fired "after he violated his probation and went to jail for alcohol and drug intoxication." *Id.* The previous ALJ decision found that Plaintiff had not engaged in substantial gainful activity since April 28, 2009, his original alleged onset date. (Tr. 63). Plaintiff asserted that he stopped working on April 28, 2009 as a result of his conditions, after decreasing his work activity in January of 2009 as a result of his conditions. (Tr. 211). In July of 2008, Plaintiff lost his license as a welder due to a DUI, but was able to continue working as a plumber. (Tr. 334). On February 5, 2009, Plaintiff was admitted to Chambersburg Hospital, and indicated that he had a job but he lost it. (Tr. 357). On August 18, 2009, Plaintiff presented to the emergency room at Chambersburg Hospital after an "overdose" from "drinking alcohol and taking Xanax" and because he "does not care anymore." (Tr. 445). Notes indicate that Plaintiff had violated parole, and needed to be taken to jail. (Tr. 445). Plaintiff "states he is depressed because of his back and loss of his job." (Tr. 445).  Thus, Plaintiff violated parole because he did not cope well with the previous loss of his job; he did not lose his job because he violated parole. Moreover, the ALJ never cites to this rationale in the decision. *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.,* 730 F.3d 291, 305 (3d Cir. 2013) (Although a Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," review must be based on "the administrative record [that

was] already in existence" before the agency, not "some new record made initially in the reviewing court or post-hoc rationalizations made after the disputed action). Finally, all of these happened well before the relevant period. *Supra.*

> Similarly, Defendant contends that:
>
> The record repeatedly confirmed that alcohol dependence was Paisley's major problem for many years, and Paisley's earnings record reveals inconsistent earnings over the span of many years (Tr. 196, 334, 357, 602). Most recently, in 2007, Paisley lost his license as a welder because of his second DUI charge and, in 2008, spent 52 days in jail; the court released him but ordered five years of probation requiring him to participate in a rehabilitation program (Tr. 334, 357, 604).

(Def. Brief at 6). However, the Defendant does not point to any medical evidence during the relevant period. Each cite to the transcript identified by Defendant in the excerpt above was from 2009 or earlier. As discussed above, Mr. Hand opined that alcohol abuse did not contribute to Plaintiff's impairments during the relevant period and his diagnoses at Chambersburg Hospital went from "partial remission" prior to the relevant period to "full sustained remission" during the relevant period. *Supra.* Defendant repeatedly emphasizes Plaintiff's prior alcohol use, involvement with the criminal justice system, and alleged sexual activity. However, the pertinent question is whether Plaintiff was disabled from June 16, 2011, to March 1, 2013, when the record indicates that he was almost totally abstinent from alcohol, Mr. Hand opined he was precluded from employment, and Mr. Hand

opined that this preclusion was not related to alcohol. Thus, the Court recommends remand for a proper analysis of Plaintiff's alleged alcohol use and/or abuse and its impact on his eligibility for disability.

## VII.    Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's social security disability insurance and supplemental security income benefits be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the

report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: August 5, 2015                          s/Gerald B. Cohn
                                  _____
                                  GERALD B. COHN
                                  UNITED STATES MAGISTRATE JUDGE